John T. Myatt v. The Ponca City Land and Improvement Company.

(Filed February 5, 1903.)

1. CORPORATIONS—Foreign—Rule of Comity. It is indispensable that a corporation seeking to invoke the doctrine of comity must first be possessed of some right, power or privilege in the country of its domicil, and unless it has both existence and some right or power there, it cannot be awarded any in a foreign state.

2. SAME—Individual Proceeded Against May Question Corporate Right. A foreign corporation, acting in excess of its conferred authority, may be questioned as to its authority only by the state. But where, in an action by a foreign corporation, there is an attempt on the part of such corporation to acquire title to property vested in an individual, such individual may, under the statute of Oklahoma, deny its corporate capacity as a defense to its right of recovery.

(Syllabus by the Court.)

*Error from the District Court of Kay County; before Bayard T. Hainer, Trial Judge.*

*H. B. Martin, Geo. S. Green and J. F. King,* for plaintiff in error.

*Hackney & Lafferty* and *James B. Diggs,* for defendant in error.

Myatt v. Ponca City Land and Improvement Co.

STATEMENT OF FACTS.

This is an action to quiet title to lot 20, block 38, in the townsite of Hartman, a legal subdivision of the city of Ponca City, in Kay county, Territory of Oklahoma.

This action was commenced in the district court of Kay county, September 1, 1900, and on November 23 following, defendant, The Ponca City Land and Improvement Co., filed its answer and cross petition.

To this answer and cross petition plaintiff made reply on December 3, 1900.

Upon the issues thus made or attempted to be made the cause came on for trial before said court at the March term, 1901, and was tried by the court without a jury, and on the 22nd day of June, 1901, judgment was rendered therein in favor of the defendant, The Ponca City Land and Improvement Co., and against plaintiff, John T. Myatt, from which judgment the plaintiff prosecutes this appeal.

The history of conditions leading up to and existing at the time of the commencement of this action, as near as they can be ascertained after a most patient and laborious examination of the 480 pages constituting the record in this case, may be stated as follows:

By an act of congress and proclamation of the President, the Cherokee Strip, embracing the present Kay county of this Territory, was opened to settlement on the 16th day of September, 1893, and on that day one Daniel F. Stiles made his "homestead entry" upon the N. W. 1-4 of section 27, in township 26 north, range 2 east I. M., of which the lot in question forms a part.

On the same day J. W. Lynch settled upon and made his

homestead entry on the S. E. 1-4 of said section and one Broadhead made his homestead entry on the S. W. 1-4 of said section.

In due course of time each of these parties made final proofs before the land department, and received the patent from the United States conveying to them respectively the title to their several quarter sections.

The patent to Daniel F. Stiles to the said N. W. 1-4 of section 27, was issued to him on July 23rd, 1895, and on the following day, July 24th, 1895, Daniel F. Stiles conveyed the same to Harry C. C. Stiles. On August 22d, 1895, Harry C. C. Stiles conveyed said quarter section to B. S. Barnes and John W. Dalton. Thereafter and on September 23d, 1895, the said B. S. Barnes and John W. Dalton conveyed lot 20 in block 38 (being the lot in question) in the then called town of Hartman, a subdivision of the town of Ponca City, to this plaintiff.

It is also alleged in the pleadings, and we do not find it anywhere disputed, that at some time in the month of September, 1893, the above named parties, B. S. Barnes and John W. Dalton, entered into a copartnership having for its object and purpose the laying out and establishing of a town upon said three quarter sections, to wit: the N. W. 1-4 and the south 1-2 of said section 27, township 26 north, range 2 east, and in the latter part of said month of September, 1893, with the knowledge, consent and approval of said Stiles, Lynch and Broadhead, the said Barnes & Dalton laid off into lots, blocks, streets and alleys, the south half of said section 27, and a part of the said northwest quarter of said section.

These parties, in order to induce settlement of their said

projected town of Ponca City, made public announcement of their said purpose, object and intentions, and held out various inducements and promises to the public in reference thereto, among which was the representation and promise to eventually obtain the fee simple title to said premises, and to convey the same to said settler upon their projected townsite for the actual cost and expenses of obtaining the title thereto, and an additional charge of $2.00 for each lot selected, settled upon or improved. Plaintiff alleges that these various promises and inducements were personally made by said Barnes & Dalton to him, and that believing the same and relying thereon, he selected and entered upon the lot in question in the latter part of September, 1893, and immediately thereafter built thereon a frame store house on a solid foundation, and thereafter enlarged the same so that the building, (for several years past and at the time of receiving his title to said lot,) was of the size of 20 by 100 feet or more.

In the month of January, 1894, the said J. W. Lynch (who had entered the said S. E. 1-4 of said section) became a member of the said copartnership firm of Barnes & Dalton, and he also joined in all the representations, promises and inducements to settlers, made by the said Barnes & Dalton.

That many hundred people, including the plaintiff, were thus induced to and did settle upon, occupy and improve the said townsite of Ponca City, so that during the years 1893 and 1894 a large and thriving town of from 1,500 to 2,500 people was established on said townsite, and that by reason of the improvements, occupation and labor of said settlers put upon the said lots, plaintiff's said lot, exclusive of the

buildings and improvements thereon, became of the value of $2,000, whereas at the time he settled upon the same its value did not exceed $1.00.

This is a rough outline of the conditions under which the said city of Ponca City originated, and which prevailed therein up to the time of the organization of the so-called corporation, "The Ponca City Land and Improvement Company," on the 12th day of December, 1894. It will thus be seen that the said firm of Barnes & Dalton for a time, and a little later, the copartnership firm of Barnes, Dalton & Lynch, were the projectors and promoters of the said town of Ponca City and by their joint and several promises, representations and inducements had persuaded and obtained people to settle upon and build up their projected town of Ponca City, to each and all of whom they were under the solemn pledge and promise of procuring and passing to them the title to their respective lots.

From this time (January 12, 1894) forward, the pleadings and proof upon both sides introduce a new factor into the case.

The parties who had composed, and at that time did compose the copartnership firm of Barnes, Dalton & Lynch, to wit: B. S. Barnes, John W. Dalton and J. W. Lynch, conceived the idea that the object and purpose of the said copartnership could be better, more conveniently and easily carried out and performed, through the medium of a corporate organization, and accordingly they journeyed to the state of Kansas, and there on the said 12th day of January, 1894, with the said (consent) of three persons there residing, formed or attempted to form the so-called corporation, "The Ponca

City Land and Improvement Company," the defendant named in this action.

This organization is best designated and described in the language of its articles of incorporation, which read as follows:

### "CHARTER.

"THE PONCA CITY LAND AND IMPROVEMENT COMPANY.

#### 1st.

"This corporation shall be known as the Ponca City Land and Improvement Company.

#### 2nd.

"The purpose for which this corporation is formed is to own, buy, sell, lease, rent, exchange and improve lands, town lots and other real estate and buildings and improvements thereon in Oklahoma Territory.

#### 3rd.

"The office and principal place of business of this corporation shall be in Arkansas City, Cowley county, Kansas. It shall also have branch offices in such places as the directors may deem necessary in the transaction of its business.

#### 4th.

"This corporation shall exist for the period of fifty years.

#### 5th.

"The number of directors of this corporation shall be seven (7) and the names and residences of those for the first year shall be:

B. S. BARNES, Ponca City, Oklahoma Ter.

J. W. LYNCH, Ponca City, Oklahoma Ter.

JOHN W. DALTON, Ponca City, Oklahoma Ter.

H. F. HATCH, Arkansas City. Kansas.

Z. T. ARMSTRONG, Arkansas City, Kansas.

H. J. HATCH, Arkansas City, Kansas.

G. B. BARNES, Ponca City, Oklahoma Ter.

### 6th.

"The capital stock of this corporation shall be one hundred thousand dollars ($100,000.00) divided into one thousand shares of the par value of one hundred dollars ($100.00) each.

B. S. Barnes, Ponca City, Oklahoma Territory.

J. W. Lynch, Ponca City, Oklahoma Territory.

John W. Dalton, Ponca City, Oklahoma Territory.

H. F. Hatch, Arkansas City, Kansas.

Z. T. Armstrong, Arkansas City, Kansas.

H. J. Hatch, Arkansas City, Kansas.

G. B. Barnes, Ponca City, Oklahoma Territory.

"State of Kansas.

ss.

Cowley County.

"Be it remembered that on this 10th day of December, A. D., 1894, before the undersigned, a notary public in and for said county and state, personally came B. S. Barnes, J. W. Lynch, and John W. Dalton, all of Ponca City, Oklahoma Territory, and H. F. Hatch, Z. T. Armstrong and H. J. Hatch, all of Arkansas City, Kansas, to me personally known to be the identical persons who subscribed the above instrument of writing and each duly acknowledged the execution of the same.

"Arthur W. Wilcox,

"Notary Public.

"[SEAL.]

"My commission expires Apr. 16-96."

"State of Kansas.

"Office of Secretary of State.

"I, R. S. Osborn, secretary of state of the State of Kansas, do hereby certify that the following and annexed is a true and correct copy of the original instrument of writing filed in my office December 12th, 1894.

"In testimony whereof, I have hereunto subscribed my name and affixed my official seal.

"Done at Topeka, Kan., this 12th day of December, 1894.

"R. S. OSBORN,

"Secretary of State.

"[SEAL.]

TERRITORY OF OKLAHOMA.
SECRETARY'S OFFICE.

"Guthrie, O. T., Jan. 17, 1895.

"I do hereby certify that the Ponca City Land and Improvement Company have this day filed in this office certified copy of their Articles of Incorporation and appointed an agent, in full compliance with the laws of this Territory.

"In testimony whereof, I have hereunto set my hand and affixed the great seal of the Territory the date first above written.

"THOMAS J. LOWE,

"Secretary of Oklahoma Territory."

Having filed their articles of incorporation with the secretary of state of the State of Kansas, they next obtained a certified copy thereof and on the 17th day of January, 1895, filed the same with the secretary of Oklahoma Territory.

The reply of the plaintiff to defendant's answer and cross petition challenges the legality and good faith of the defendant's organization and denies its corporate existence at all, and to this reply no rejoinder was made.

It appears from the evidence of defendant that David C. Prior and Chester Howe were also in some manner interested in the copartnership or syndicate, as it seems to have been commonly called, which preceded the said corporate incorporation of defendant, but what the amount of their interest was, or of what it consisted, is not disclosed by the record,

except that it is alleged that Prior was to have one-seventh interest in the said syndicate. It further appears that the said Barnes, Lynch, Dalton and Howe had the active control and management of the business of said syndicate. That the syndicate had arranged and agreed with said Broadhead, and with said J. W. Lynch for the conveyance by each of them of the quarter sections of said section 27, upon which they had respectively settled and made homestead entry, together constituting the said south half of said section 27, township 26 north, range 2 east, and in like manner had arranged with said Daniel F. Stiles to convey to said syndicate a portion of the N. W. 1-4 of said section, which with the said south half would constitute the village of Ponca City. That thereafter the said James W. Lynch, Burton S. Barnes, John W. Dalton and Chester Howe, the agents and managers of said syndicate, did proceed to and did organize the corporation "The Ponca City Land and Improvement Co.," and for that purpose associated with themselves three citizens of the State of Kansas as charter members thereof, to wit: H. F. Hatch, H. J. Hatch and Z. T. Armstrong, but that said last named three parties possessed no interest whatever in such organization.

Lynch and Broadhead complied with the contract made with the syndicate, and after the organization of the corporation conveyed their respective quarter sections, to wit: The S. E. and the S. W. 1-4 of said section 27, to the said corporation. At what time this was done is not disclosed by the record.

After the organization of the corporation, the said Barnes, Dalton, and Lynch received from the said Harry C. C. Stiles a conveyance of a portion of the said N. W. 1-4 of said section

27, this last conveyance embracing the lot in controversy in this action, which conveyance, however, ran to said Burton S. Barnes and John W. Dalton, and not to said corporation or the officers thereof.

The corporate existence of defendant was challenged by the reply of the plaintiff, and again by the objection to the reception in evidence of its charter, and repeated in the demurrer of plaintiff to the evidence of defendant, and lastly by the motion for a new trial.

The cause was tried in the court below upon two principal issues: ·

1st.   The legal capacity of the defendant corporation to maintain an action to obtain title to the premises in controversy.

2nd.   The doctrine of *lis pendens,* by reason of the pendency of cases 452 and 453 at the time of plaintiff receiving his title.

Many questions were raised and litigated upon the trial, and are repeated in the briefs filed in this court, but as we have reached such a conclusion upon the first proposition as necessarily disposes of the case, it becomes unnecessary to pass upon the numerous questions involved in the second.

Opinion of the court by

GILLETTE, J.:   The foregoing is as near a statement of the origin of this corporation as we are able to evolve from the 400 and more pages of record before us.

The various proceedings and transactions of this assumed corporation since the filing of its articles of incorporation are not disclosed by the record, and in the view we have taken of

the case it becomes unnecessary to unravel all its mysterious manipulations and proceedings.

If anything were needed to add to or confirm our impressions of the chief object and purpose of its creation, it would be furnished by the end sought to be attained by defendant in error in this action. One commendable thing on the part of its promoters and officers in their indivdiual capacity stands out above all question, and that is they seem to have honestly attempted to keep good faith with this plaintiff, and to have performed the contract they entered into with him at the time he settled upon the townsite of Ponca City.

The plaintiff's title is derived by a straight chain from the Government to himself and, unless tainted with some fraud upon his part, must be sustained.

There is nowhere in the case any conflict in reference to the syndicate or corporation, its object and purpose, and the persons composing it, from about the 16th of September, 1893, to the time of the organization of the defendant corporation. Neither does it seem to be anywhere disputed that the corporation was organized or attempted to be, for the express purpose of more easily and readily transacting the business of said pre-existing syndicate.

It is urged by the plaintiff in error that the court erred in quieting the title to the lot in question in the Ponca City Land and Improvement Company, for the reason that under its charter it could not acquire and hold real estate in Oklahoma Territory.

It will be observed that the charter of this corporation did not authorize it to transact any business, or have any vitality in the state of Kansas. In short, the announced and

sole and only purpose and object of its incorporation was to carry on and transact the business specified in its charter in the Territory of Oklahoma.

It is admitted upon all hands, and is now too well settled to be disputed, that the several states of this Union are sovereign within their territorial limits, and it therefore necessarily results that their sovereignty and power to legislate, stops at their boundary lines. Kansas could not pass any act of legislation to take effect as such beyond its boundary lines. Any right, power or authority of one of the states of this Union, to be exercised and enforced beyond its borders, would have no binding force or effect as a statute of such state in the jurisdiction where such power is sought to be exercised. whatever force or effect it might have in a foreign jurisdiction would be given it by the comity of nations existing between the several states, and not *proprio vigore* as a statute law.

Comity is defined by Webster as, "Courtesy between equals; friendly civility," and he gives as synonyms, "civility, good breeding, good will." And comity of nations is defined as: "The courtesy by which nations recognize within their own territory, or in their own courts, the peculiar institutions of another nation; or the rights and privileges *acquired by its citizens in their own land."* Bouvier defines it as: "The most appropriate phrase to express the true foundation and extent of the obligation of the laws of one nation within the territory of another. It is derived altogether from the voluntary consent of the latter, and it is inadmissible when it is contrary to its known policy or prejudicial to its interests. In the silence of any positive rule affirming or denying or restraining the operation of foreign laws, courts

of justice presume the tacit adoption of them by their own government, unless repugnant to its policy or prejudicial to its interest. It is not the comity of the courts, but the comity of the nation which is administered and ascertained in the same way and guided by the same reasoning, by which all principles of the municipal law are ascertained and guided." (Bouvier's L. D. p. 254; Story, Confl. Laws, 38).

With this definition and exposition of the word comity it is manifest that when one sovereignty attempts to legislate for, and to create legal rights and obligations in another, comity is not consulted or invoked.

It is undoubtedly true that where, under the authority of a state, an incorporation is authorized for a purpose peculiar to that state, which is not authorized by the laws of another state, and, in the conduct of the business of such corporation, the acquisition of title to land, or the purchase and ownership of property, in such other state becomes necessary, such property may be purchased and owned, as the purchase and ownership is only ancillary to the organization of and conduct of the business in the state where such corporation was organized, and for the conduct of which the corporation is formed. But this is a distinct proposition from that by which it is contended that one state may authorize an incorporation, the primary object of which is the purchase of and speculation in lands of such other state. We cannot find an authority which goes to this extent, and upon reason we think the proposition must be denied.

Comity can only arise when a citizen, whether natural or artificial, of one state, having certain powers, rights or privileges in the state of his domicil, passes into another state and

there desires or attempts to exercise these same privileges or powers.

Thus viewed and understood it is indisputable that the party seeking to invoke the doctrine of comity, must first be possessed of *some* right, power or privilege in the country of his domicil, and unless he has both existence and some right or power there, he cannot through the medium of comity be awarded any in the foreign state.

Corporations are created for some purpose other than the mere exercise of creative power, and consequently when a corporation is attempted to be created without giving to it any power to act in the state of its creation, it can exercise none in any foreign country.

Where one state attempts to legislate for the exercise of power solely in another state, there is no opportunity for the application of the doctrine of comity, and to recognize the binding force of such enactment upon the ground of comity would be a recognition of a legal right to exercise sovereignty beyond its territorial limits, and a surrender of sovereignty and legislative authority by the state whose limits and jurisdiction have thus been invaded and usurped. In this instance if the State of Kansas may rightfully legislate into existence a corporation with no power to act, except in Oklahoma, then it must be conceded that the legislature of Kansas has jurisdiction over Oklahoma, which by comity the courts of Oklahoma must acknowledge and enforce. No such result can be deduced from the authorities on this subject.

Sec. 2 of the charter of this supposed corporation reads:

"The purpose for which this corporation is formed is to own, buy, sell, lease, rent, exchange and improve lands, town

lots and other real estate and buildings and improvements thereon in Oklahoma Territory."

In *Land Grant Railway Company v. Commissioners of Coffey County,* 6 Kan. 245, it was held that a corporation organized in the State of Pennsylvania with authority to transact and carry on its business anywhere *except* in the State of Pennsylvania had no right or power to transact business in the State of Kansas and that no rule of comity on the part of Kansas towards the State of Pennsylvania required the recognition of its powers as enumerated in its articles of incorporation. We can see no substantial difference between the case at bar and the one above cited, for while the State of Pennsylvania provided that the Land Grant Railway and Trust Co. might transact its business anywhere *except* in the State of Pennsylvania, in this case the State of Kansas provides that the defendant in error shall have power to transact its business only in Oklahoma and grants to it no power to do business in the State of Kansas. We do not think it necessary to cite authorities to the effect that the powers of a corporation are limited to those specially enumerated in its charter and those incident thereto.

By no rule of construction or rational use of language can this be said to be an Oklahoma corporation, for it is neither authorized by the laws of Oklahoma, nor does it pretend to be organized under them, or to have its home in reach of their authority. For similar reasons it cannot be held to be a Kansas corporation, for it is neither authorized to do business in that state, nor created for the purpose of doing any business under the authority of the laws of that state.

To the same effect is the case of the *State of Kansas ex rel v. The Topeka Water Company,* 61 Kan. 547; for while it was held by a majority of the court in this last case that defendant therein, organized under the laws of New Jersey, had power to construct and operate a water works system for the city of Topeka, Kansas, yet the recognition of this power by the state of Kansas was distinctly put upon the ground that the corporation had also power and authority to construct and operate a system of water works in the state of New Jersey, the court in that case using the following significant language:

"If it be determined under the written articles of association (the charter) that the company was granted power therein to operate one or more water works plants in the State of New Jersey, it then follows that its right to own and operate the property in question is secured. We think, as before stated, that the power *was* conferred by this charter to own and operate water works anywhere in the United States, including New Jersey."

As will be seen the court in that case finds that the company had power to construct and operate water works in the state of New Jersey and concludes therefore that under the rules of comity, it had power to also construct and operate water works in the city of Topeka, Kansas, and thereby distinguishes the case from *Land Grant Railway Co. v. Commissioners of Coffey Co., supra.* Even this conclusion is strongly resisted in a dissenting opinion by Chief Justice Doster, on the ground that it was manifest that the intent and purpose of the organization of the water company was to do business in the State of Kansas, and not primarily in the State of New Jersey.

By no jugglery of words can it be claimed, much less shown, that the Ponca City Land and Improvement Company, under its charter, is authorized to "own, buy, sell, lease, rent, exchange and improve lands, town lots and other real estate and buildings and improvements thereon" in the State of Kansas.

The rule of comity recognized and applied by the State of Kansas to foreign corporations, ought to be entirely acceptable when applied to her own creations by a foreign sovereignty.

In the last above cited case the majority opinion of the court lays down the proposition that the authorized powers granted by a charter must be interpreted strictly against the donee in the grant, using the following language:

"While it is a canon of construction that such charters must be interpreted strictly against the donees in the grant, yet we cannot, even in the light of this rule, conclude that under the various sections of this charter, the operations of the company, and its powers to act, were confined to Shawnee county, Kansas."

The plain import of this language is that if it were so limited, the corporation would have had no power under its charter, to carry on its business in the State of Kansas, and Chief Justice Doster in his dissenting opinion addressing himself to the same proposition says:

"It is a fundamental rule in the construction of public grants, made without consideration, that they are construed most strongly against the donee. This applies to grants of corporation franchises as well as to grants of all other character. The same rule of construction should apply to the certificate of incorporation or articles of association between corporations. In stating the object of their association these

corporators choose their own language, and in the exercise of the special privileges they ask and obtain they should be strictly limited by the terms they themselves use."

Applying the rule here laid down and strongly stated by the Kansas court, to the articles of association here under consideration, is it not plain that the only power sought to be granted, and the only power asked for by the corporators, is the power to speculate in real estate in the Territory of Oklahoma? Whether this power could, under the laws of Kansas, be conferred upon a corporation to be exercised in that state, is exceedingly doubtful. Certain it is that a corporation for this purpose could not be granted under the laws of this Territory.

If Kansas may grant such powers as are enumerated in this charter and the same are enforceable in Oklahoma under the law of comity between states, it must be admitted that the State of Kansas has the jurisdiction and right to legislate concerning powers and privileges not within its jurisdiction, and which belong exclusively to Oklahoma, if indeed Oklahoma is not barred from such legislation by the Statutes of the United States. By section 6 of the Organic Act of the Territory of Oklahoma, it is provided:

"Sec. 6. That the legislative powers of the Territory shall extend to all rightful subjects of legislation, not inconsistent with the Constitution and laws of the United States."·

Sec. 1889 of the General Statutes of the United States provides:

"The legislative assemblies of the several territories shall not grant private charters or especial privileges but they may, by general incorporation acts, permit persons to associate themselves together as bodies corporate for mining, manufac-

turing, and other industrial pursuits, or the construction or operation of railroads, wagon roads, irrigating ditches, and the colonization and improvement of land in connection therewith, or for colleges, seminaries, churches, libraries, or any benevolent, charitable or scientific institution."

Counsel for defendant in error at the outset of their brief upon this branch of the case, cite and quote the statute of the State of Kansas under which they claim this corporation to be organized, viz:

"The purposes for which a private corporation may be formed are the purchase, location and laying out of townsites, and the selling and conveyance of the same in lots in subdivisions or otherwise."

Counsel then proceeded: "It is clear that under this provision of law a corporation could be legally incorporated to acquire the title to real estate in Oklahoma, and as the charter does not *prohibit it* from holding land in the State of Kansas, or anywhere else, it necessarily follows that it would have such power."

We are unable to reach the conclusion that counsel for defendant in error have so readily arrived at as to the power conferred by the Kansas statute. Under that statute undoubtedly a corporation may be formed for the purchase and laying out of townsites and the selling of the same in lots and subdivisions. This authority deals with what is ordinarily termed a townsite company, while nothing of this kind is expressed in the charter under consideration, for it appears that under this charter there is authority for the transaction of a general real estate business. It was formed for the sole purpose of buying and selling real estate in general. In fact, its language is broad enough to enable it to buy and own every foot of real estate in the Territory of Oklahoma.

Such authority as this is not, in our judgment, conferred by the statute of Kansas, and the exercise of such corporate power is expressly forbidden by the statute of the United States above quoted.

Counsel for the defendant in error have with commendable energy and distinguished ability pointed out many cases upon which they rely for an affirmation of the judgment of the trial court, and to sustain their contention that "a private individual and litigant cannot question the right of a foreign corporation to hold real estate in a state or territory, such question being solely one between the commonwealth and the corporation."

It will here be observed that the case under consideration does not cover the ground here proposed by counsel for defendant in error, for the reason that it is not an action brought for such a purpose. This was an action originally brought to quiet the title of the plaintiff in and to the town lot in question, and plaintiff declares himself to be the holder of both the legal and equitable title in fee simple, and charges that the defendant company claims some interest or estate therein adverse to the plaintiff, which is a cloud upon his title, and asks to have the same removed. Defendant, answering to this petition, charges that the plaintiff's title is in fraud of the rights of defendant thereto, for the reason that his grantors were officers of the defendant corporation, and conveyed to plaintiff a title which rightfully belonged to defendant; which answer is followed by a cross petition wherein defendant asks for the cancellation of plaintiff's title, for the possession of said property, and for the sum of $1000 damages for its unlawful detention.

Plaintiff replied to this cross petition by denying its allegations, and denying the corporate capacity of defendant to maintain its action. Upon the issue thus formed the cause went to trial, at the close of which defendant waived its right to possession to or for damages for detention, and asked only to have the title decreed in itself. It will be seen therefore that this is an action by the defendant in its alleged corporate capacity to recover from the plaintiff the *legal* title to the lot, and the question here presented is the capacity of the defendant cross petitioner, to maintain the action.

The defendant cross petitioner submitted its proofs including a copy of its articles of incorporation, to the introduction of which plaintiff objected, which objection was overruled and excepted to, and, at the close of defendant's evidence, demurred thereto, which was likewise overruled and excepted to. This procedure is in accord with the statute of this Territory. Sec. 89, of chapter 66, General Statutes of 1893, which provides:

"The defendant may demur to the petition only when it appears on its face   *   *   *.

"2nd. That the plaintiff has no legal capacity to sue."

And section 91 of said chapter provides:

"When any of the defects enumerated in section 89 do not appear upon the face of the petition the objection may be taken by answer."

This defect of want of capacity did not appear on the face of the petition, and it was properly taken advantage of by reply, under the provisions of the statute above quoted, as well as by objections to the introduction of its charter in evidence and the demurrer to defendant's evidence at its

close.   Thus we are brought face to face with the proposition touching the corporate existence of defendant corporation, and its right to recover in this action.   .

This is not, therefore, an action by an individual seeking the cancellation of articles of incorporation from a foreign state, but is an action resisting its right of recovery under its articles of incorporation, upon the ground of a want of corporate power.

A judgment denying its (defendant's) right to recover upon the ground of a lack of corporate capacity, is only incidental to a determination of the plaintiff's right to recover.

To recapitulate and summarize, in order to be clearly understood as to the issue in this case presented, let it be understood that the plaintiff in this case is not seeking to question the right of a foreign corporation to hold real estate in this Territory.   In this case the corporation has not acquired, but is now by this action seeking to acquire the lands and premises in question; and plaintiff, now owning and in possession of the premises, is simply resisting this effort on the part of the corporation to acquire and take from him the lands in question.   Defendant corporation never has had either title to or possession of this lot, and its only claim and demand now is to have the legal title declared in it, by reason of the equitable claim it makes thereto.   It will thus be seen that the corporate right of defendant is presented to the  court in the same  manner as in *Land Grant Ry. Co. v. Commissioners of Coffey Co.,* 6 Kan. 245; *Caroll v. East St. Louis,* 67 Ill. 568.

We will notice some of the  cases presented by defen-

dants in error, which are cited as antagonizing the proposition above stated. The strongest of these, and the one most nearly in line with defendant in error's theory, is *Colwell v. Colorado Springs Co.,* 100 U. S. 55. In this case the patentee of lands from the United States conveyed to the National Land and Improvement Co., of El Paso county Colorado, a corporation created under the laws of Pennsylvania, with power to acquire, hold and grant lands located in Utah, Arizona or adjoining states and territories lying west of the Mississippi. The day following the conveyance by the patentee to the Pennsylvania Company, such company conveyed the lands to the Colorado Springs Company, a company incorporated in Colorado in 1871, with power to hold and dispose of lands, town lots, mineral springs and other property; also to construct and operate railroads, wagon roads and mills for manufacturing lumber and generally to do all things authorized by the laws of the territory which might tend to accomplish the purpose stated. At the time of the incorporation of this Colorado Springs Company, the legislature of Colorado was not empowered to authorize the formation of corporations to aid and encourage immigration, and for that purpose to take, possess and convey real property in the territory. Therefore, the defendant contended that the company and its grantor, the Pennsylvania company, could not acquire a right to the premises in controversy. And in response to this position the supreme court says:

"For some of the purposes designated in the articles of incorporation, the law in existence authorized the incorporation of companies; therefore, the incorporation here was not wholly illegal.

"A corporate body competent to exercise some of the

powers mentioned was created, and under the statutes of the
territory could acquire, hold and convey by deed or other-
wise, any real or personal estate whatever, necessary to en-
able it to carry on its business. Whether the particular
premises in controversy are necessary for that business is not
important; that is a matter between the government of the
state, succeeding that of the territory, and the corporation,
and is no concern of the defendant. It would create great
inconveniences and embarrassments if, in actions by corpor-
ations to recover possession of their real property, an inves-
tigation was permitted into the necessity of such property
for the purposes of their incorporation, and the title made
to rest upon the proof of that necessity."

It is plain that the court is here passing upon a propo-
sition materially different from the one under consideration.
The question in that case involved the proposition of the
*necessity* of this property by the company for the purpose of
its corporate business, a part of these purposes being author-
ized and a part unauthorized by the law of the territory, and
the court says that it is a matter of concern to the territory
and not to the defendant whether or not this particular piece
of property was necessary to the legal or illegal purposes
of the incorporation.

In the case at bar, the necessity of the property in ques-
tion to the conduct of the defendant's business is not involv-
ed. The question here is as to whether or not the defendant
corporation, organized for no other purpose than the owner-
ship of real estate in Oklahoma, may sue for and recover
upon its equitable rights a title which has never been vested
in it; and herein lies a marked distinguishing feature, for
in this case the only business of the defendant is the owner-
ship of and power to speculate in real estate, which it seeks ·

to acquire, never having had the legal .title thereto; while in that case the defendant is questioning the conditions of a title from the corporation to himself, and is therefore denying the power of his own grantor to pass to him a title with covenants which he has accepted. We think it may be stated as a fundamental proposition that a party is estopped, when sued by his grantor for a breach of the covenant, from denying the capacity of his grantor; and this especially, when he seeks to retain the property so purchased after condition broken, and to avoid the covenant. How a corporation organized in Kansas for the primary and sole purpose of doing business in the Territory of Oklahoma with no power to do any business in Kansas, and with only such powers in Oklahoma as .are granted to it by the laws of Kansas, can be supported and upheld by *Colwell v. Colorado Springs Co.,* we confess our inability to understand.

In that case it was admitted that the corporation was organized under the laws of the then Territory of Colorado, with some powers to act therein. In this case the corporation is not organized in this Territory, and its existence as a corporation is wholly denied.

To the same effect, but with less application to the facts in this case, is *Runyon v. Coster,* 14 Pet. 120.

In that case the defendant in error, Coster, as trustee of the New York and Schuylkill Coal Co., brought suit to oust the plaintiff in error, Runyon, from the possession of certain lands in the State of Pennsylvania.

The plaintiff introduced evidence of title and proof of its incorporation under the laws of the State of New York, and the defendant below, without offering any evidence, ask-

ed the court to charge the jury in his favor, but the court gave the contrary direction.

It appears from this case that the New York and Schuyl-kill Coal Company was incorporated under the authority of an act of the legislature of New York for the purpose of supplying New York City and its vicinity with coal. Runyon, the plaintiff in error, having secured possession of the land, action was brought to oust him from posesssion. Under the law of Pennsylvania, lands held by corporations without a license from that state, escheated to the commonwealth. The court held that the right of action assumed by the plaintiff in error was one that belonged exclusively to the state. In addition to the reasons assigned for the conclusion of the court, it will be observed that the New York company was chartered for the purpose of doing business in New York, (to wit: Supplying the city with coal,) and, in the absence of a statute of the kind mentioned, in Pennsylvania, under the law of comity, that the company might rightfully hold land in that state. We think there can be no question, that if the statute of Pennsylvania interfered, it would so interfere for the benefit of the state, and not for the benefit of the plaintiff in error.

To the same effect is *Hickory Farm Oil Co., v. Buffalo, et al,* 32 Fed. 22.

Defendant in error has cited numerous authorities, all of which tend to establish the proposition that an individual may not maintain an action on his own behalf to recover for his individual use and benefit a title which has vested in a corporation, where such corporation is not authorized to purchase and hold the same, and to the effect that the power to

question the corporation's right to hold, is vested alone in the state.

We do not question these authorities. When a person empowered to transfer the title to real estate 'conveys the same to a corporation, the title passes from him, and whether rightfully or wrongfully, must be vested in the corporation, and it does not lie with him or any one else claiming through or under him to dispute the right of the corporation to re-- ceive the same. In such case, the state alone may question the right of the corporation to take and hold the title. But this is quite a different question from that in which a cor- poration, having no power or right to take and hold title to any property, attempts to take from another the title and property which he now rightfully holds.

In the one case the corporation takes the title because it must vest somewhere; and having passed from the grantor it must vest in his grantee. In the other, the corporation is seeking to acquire title not vested in it, and which is vested in the one from whom he seeks to recover it. And the dis- tinction is more apparent when it appears that the corpor- ation has no existence, and therefore no capacity to legally acquire property of any kind.

In this case the corporation is invoking the power of the state, through the medium of the courts, to secure to it a title which it may not hold, and when its want of capacity is shown judgment should be entered against it. Such want of capacity may be shown by one in whom the legal title is vested in resisting the attempt of such corporation to acquire that title.

There is another phase of this case which we think de-

serves consideration.    It is shown by the record that the lot
in question, in 1893 was a part of the homestead entry of
D. F. Stiles, and that while said Stiles held and occupied the
same under his homestead entry, Barnes & Dalton proceeded
to organize a townsite movement upon this land, and that
one Lynch and one Broadhead, adjacent thereto, and in con-
formity to their general scheme, laid off portions of this
(Stiles') land in town lots and blocks, and proceeded to
induce townsite settlers to locate thereon, charging a small
entrance fee, for which they gave a certificate, promising in
each instance to procure for the townsite settlers legal titles
to the lots settled upon and improved.    Under this arrange-
ment the plaintiff in this case went on to the lot in question,
and built thereon permanent and valuable improvements
which remain to this time.

Afterwards D. F. Stiles made final proof on the land,
and deeded the same to Harry C. C. Stiles, who in turn
deeded it to Barnes & Dalton, and Barnes & Dalton conveyed
the lot to plaintiff, John T. Myatt, in consideration of $100.00
then paid.

Prior to this time, Barnes & Dalton had gone to the
State of Kansas, and there caused (or attempted to) the in-
corporation of defendant corporation under the laws of that
state.    To do this it became necessary, under the laws of
Kansas, to associate three persons, residents of that state, to
join in the organization of defendant corporation.    The rec-
ord in this case accounts for all the stock of the corporation,
but none of it appears to have ever been subscribed or held
by either of the three signers residents of Kansas.    Indeed,
the record distinctly shows that none ever was issued to them

·or intended to be. Barnes testified that he and Dalton held a two-thirds interest and Lynch the other third, of all the interests of the company, and this evidence was not disputed.

It is stated in the pleadings and shown in the evidence that Barnes, Dalton and Lynch, at the time of the organization of said corporation, were all residents of the Territory of Oklahoma, but deemed it *more expedient* to organize the same under the laws of the State of Kansas. When it is remembered that a corporation for such purposes *could not* be legally organized under the laws of Oklahoma, it becomes manifest *why* it was more "expedient" to organize under the laws of Kansas. But when it further appears that they call to their aid for the purpose of organization three persons, to wit: H. F. Hatch, H. J. Hatch and Z. T. Armstrong, residents of that state, strangers, and in no way interested in the formation of the corporation, and whose only connection with it has been to sign their names to its charter, it then becomes manifest also that the said corporation was created by a fraud upon the laws both of Oklahoma and Kansas.

Barnes, Dalton, Lynch, Howe and Prior, in fact, all persons connected with this corporation, who, prior to the time of its organization had formed what is termed the syndicate for the establishing of the town of Ponça City, engaged in such undertaking in direct violation of the laws of the United States.

Every manipulation entered into between them and the homestead settlers was void because in violation of and prohibited by the laws of the United States. They could not organize under the laws of Kansas a corporation for the

purpose of carrying out their townsite scheme, which, when organized, would stand cleansed of their individual wrong and fraud, by inviting into it three dummies from Kansas. This corporation coming into existence (if it ever had any) as the Ponca City Townsite Co., burdened with the · illegality of purpose which gave it birth, and being a corporate· entity within and of itself, innocent of intentional wrong, was nevertheless charged with the errors of its founders, because of its being brought into existence in order to consummate such errors to the profit and advantage of those· who gave it being.

The stream cannot rise higher than its source and this· corporation can stand upon no higher ground or be entitled to no greater rights than its founders and creators. It cannot· sue for and recover that which its founders were barred from acquiring.

Incorporation was never intended as a cloak to cover crime, or to enable individuals to perpetuate a wrong · or· profit by a fraud.

This corporation was not so separated from its incorporators and officers as to give it a right to sue for and obtain that· which its officers would have been barred from acquiring. Barnes, Dalton & Lynch before the formation of this corporation had agreed that the title to this lot should be conveyed to Myatt, and that they would procure the title and convey the same to him.

They placed him in possession, and on the faith of their· carrying out this agreement, Myatt entered into open and notorious possession of the premises, and erected thereon valuable and permanent improvements, and later paid to Barnes,

and Dalton $100 at the time the conveyance was executed and delivered to him.

All this Barnes, Dalton & Lynch knew when they organized this corporation, and what they knew as individuals they could not be ignorant of as officers of the corporation, nor can the corporation be held innocent of what its president, secretary and treasurer well knew, nor yet can it be permitted to profit for their benefit, where they themselves would be estopped.

The cause was tried in the court below mainly in reference to the issue of *lis pendens* notice made by the pleadings, and the briefs of counsel filed in this court are principally devoted to a discussion of that question; but the conclusions we have reached upon the first branch of the case, make it unnecessary to enter upon the discussion of that question, or of the many exceptions to the rulings of the court in reference to the admission of evidence upon the trial.

Having determined that the organization of the defendant corporation, The Ponca City Land and Improvement Company, was wholly illegal and void, it follows as a necessary result that the judgment of the court below, quieting the title to these premises in the said corporation, must be set aside, and the cause remanded with directions to enter judgment in favor of and quieting the title in the plaintiff, John T. Myatt.

Hainer, J., who presided in the court below, not sitting; Beauchamp and Irwin, J. J., absent; Burford, C. J., and Burwell, J., concurring in the judgment, but not in all of the reasons given; the other Justice concurring.

Myatt v. Ponca City Land and Improvement Co.

OPINION ON REHEARING.

(Filed September 1, 1904.)

PANCOAST, J.: The original opinion in this case was handed down at the February sitting of the January, 1903, term. The case had been given that careful consideration which is usual, and it was deemed that all propositions necessary for the correct determination of the case had been considered and correctly analyzed.

Within the time prescribed by the rules, a petition for rehearing was filed which attacked every material question decided by this court, even to the extent of alleging that some of the authorities cited did not sustain the doctrine they were cited to sustain; that others had been either overruled or departed from; that the issues had been misconceived; that the questions here involved could only be litigated in direct proceedings instituted by the sovereign, and even that we had failed to read the defendant's charter correctly. These assertions were made with such energy, and bold and apparent confidence, that out of abundant caution the petition for rehearing was sustained. Additional briefs were filed, and additional time was consumed in oral argument; and after diligently investigating the labyrinth of record and briefs which is now a part of this case, we have arrived at the conclusions which we expressed in the former opinion, and feel entirely satisfied with the principles therein laid down.

Possibly no good purpose will be subserved by the reiteration of the principles heretofore laid down; and yet, owing to the storm of disapproval raised by the defeated parties

upon the filing of the former opinion, it may not be amiss to emphasize, as it were, some of the propositions heretofore enunciated.

It will be noticed by carefully anaylzing the petition for rehearing and the various briefs filed in support of the contentions, that the first rule of law contained in the syllabus of the opinion is entirely lost sight of in the avalanche of authority and argument of counsel for the defendant in error; and that the question contended for, that a foreign corporation acting in excess of its conferred authority may be questioned as to its authority only by the state, is a rule adhered to and laid down as a correct proposition of law, in the first part of the second syllabus.

No distinction, however, is sought or attempted to be made by counsel between cases questioning the right of a corporation to hold property already acquired which is in excess of its authority, and where there is an attempt on the part of such corporation to acquire title to property which is vested in an individual, where the right to hold such property is in excess of its conferred authority. And it is largely upon this distinction that the former opinion is based.

In support of the contentions that the decisions cited by this court did not sustain the doctrine they were cited to sustain, counsel undertake to dissect the case of the *Land Grant Railway Co. v. Coffey County,* 6 Kan. 245, and, among other things, claim that this case is not upheld by the authorities, has no support from the other courts, and has been overruled. Why such an assertion as this should be made we are unable to say, because it is made in face of the fact that this case has been cited by numerous courts and ap-

proved and upheld in every instance in which it has been cited. The cases which have been called to our attention in which the Kansas case has been cited with approval, include Judge Thompson's work on Corporations, Morawetz on Corporations, Beach on Private Corporations, the New York court of appeals, the supreme court of Wisconsin; and no doubt other citations of approval could be found of equal weight if effort were made in that direction.

The principles involved in this case were not new even at the time the case was decided. The decision was in perfect harmony with the underlying principles upon which it was based, and it was only because of the vigorous language used, and the vast financial interests involved, that this decision caused any more comment or notice than any other involving the same general principles.

There is one proposition involved in that decision which, like many in this case, is entirely overlooked by counsel for defendant in error. The state or sovereign was not a party to that case. The question involved was the right of the company to acquire property, viz: the bonds of the county. No question arose there over property previously acquired by the company, but it arose over the right of the company to acquire additional property, and the county contested that right.

In this particular, then, that case and the one at bar are exact parallels; that is, it is not a case in which the state or sovereign was attempting to question the legality of the company's franchise. The defense was one questioning the right to compel a transfer of property by the county to the company, as Myatt in the present case is questioning the

right of the company to compel a transfer of property which he owned, and in which the company claimed an interest.

This Kansas case as well as numerous others, many of which are cited by counsel for defendant in error in their brief upon other propositions, show as conclusively as any proposition of law can be shown, that there are instances where an individual may contest the right of a corporation to acquire property, and in order to successfully maintain his contentions he may plead and prove that the corporation has no legal right to acquire the property contended for. This principle has been decided time and again by the courts of the different states; and was likewise so decided in the early days of the supreme court of the United States, and has been followed from that time to the present.

Some of the principles underlying this case are decided in the case of *Paul v. Virginia,* 8 Wall. 168, and in this decision, the early case of the *Bank of Augusta v. Earl,* 13 Pet. 519, is commented upon and approved.

In the case of *Paul v. Virginia,* the court lays down the proposition; that artificial persons created by the legislature possess only the attributes which the legislature has prescribed. And again, the court lays down the proposition that a corporation has legal existence alone in the state where created.

Again, the court says:

*   *   *"That the clause of the Constitution could never have intended to give the citizens of each state the privileges of citizens of the several states, and at the same time to exempt them from the liabilities attendant upon the exercise of such privileges in those states; that this would be. to give the citizens of other states higher and greater privi-

leges than are enjoyed by citizens of the state itself, and would deprive each state of all control over the extent of corporate franchises proper to be granted therein."

"It is impossible," continued the court, "upon any sound principle to give such a construction to the article in question."

Should the defendant in error be held to have the right to acquire the property in the manner in which it is sought to be acquired in this case from the plaintiff, and to enjoy the privileges sought to be conferred by the charter, it would have the effect to give to the corporations of Kansas a greater and more unlimited privilege and authority than the Territory will allow its own domestic corporations, for there is no provision of law, as stated in the former opinion, which will allow a corporation to be formed for the purposes mentioned in the second article of the defendant's charter; and the United States statute forbids the territorial legislature granting private charters and special privileges, and specifies the purposes for which corporations may be formed.

Again, the court in the case last cited says:

*   *   *"The corporation being the mere creation of local law, can have no legal existence beyond the limits of the sovereignty where created. As said by this court in *Bank of Augusta v. Earl,* 'It must dwell in the place of its creation, and cannot migrate to another sovereignty.' The recognition of its existence, even by other states, and the enforcement of its contracts made therein, depend purely upon the comity of those states—a comity which is never extended where the existence of the corporation or the exercise of its powers are prejudicial to their interests or repugnant to their policy. Having no absolute right of recognition in other states, but depending for such recognition and the enforcement of its contracts upon their assent, it follows,.

as a matter of course, that such assent may be granted upon such terms and conditions as those states may think proper to impose. They may exclude the foreign corporation entirely. They may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion."

\* \* \*"And if, when composed of citizens of one state, their corporate powers and franchises could be exercised in other states without restriction, it is easy to see that, with tne advantages thus possessed, the most important business of those states would soon pass into their hands. The principal business of every state would, in fact, be controlled by corporations created by other states."

Now, as stated in the former opinion, it is doubtful indeed if the laws of Kansas authorize a corporation to be formed for the purposes named in the charter of this company. Indeed, this is a very favorable statement for the defendant in error, a more favorable statement, we think, than the courts of Kansas would give it, if the questions here involved were being litigated there. At any rate, until the passage of the act of 1903, which we will hereafter notice, the laws of this Territory did not authorize the formation of a corporation to transact the business named in the charter of the company, nor the business it was assuming to carry on. The statutes of this Territory and of the United States lay down specifically those purposes for which corporations may be organized. The purposes are limited. The authority to organize for the purpose of "owning, buying, selling, leasing, renting, exchanging and improving lands, town lots and other real estate and buildings and improvements there-

on" are not included in any provision for which corporations may be organized. The statute having defined specifically the purposes for which corporations may be formed, all others are excluded.

It is plain, therefore, that the defendant corporation in this case is seeking to exercise a privilege which cannot be enjoyed by any of the corporations of this Territory be cause authority to organize for such purpose is not conferred by any law of this Territory.

Referring to the case of the *Bank of Augusta v. Earl,* 13 Pet. 519, we wish to notice some of the propositions there decided. Before doing so, however, we wish to state that this case was one of the Bank of Augusta, a corporation of the state of Georgia, against a citizen of Alabama, brought to recover on a bill of exchange discounted at Mobile, Alabama, by the agent of the bank, and which had been protested for non-payment. The bill was made and endorsed for the purpose of being discounted by an agent of the bank who had funds in his hands belonging to the bank, for the purpose of purchasing bills of exchange, which funds were derived from the bills and notes discounted by the bank in Georgia. The bill was discounted by the agent of the bank in Mobile for the benefit of the bank. The defense was that the Bank of Augusta had no authority to discount bills of exchange outside of the state in which it was created, and that a contract of such character made with individuals outside of the state was illegal and void.

The court below held that the plaintiff could not recover, and that the purchase of the bills by the agent of the plaintiff was prohibited by the laws of Alabama, and gave

judgment for the defendant. The supreme court reversed the trial court, and in doing so enunciated some of the propositions that have since been universally followed by that court as well as by others.

The first proposition we wish to notice is this: That the power of a corporation to transact business beyond the limits of the state in which it was incorporated is questioned. In fact, that is the principal question in the case. Another feature of the case should be noticed. This was not a direct proceeding by the sovereign to annul the franchise, but it was a case by the corporation against an individual, which individual was seeking to avoid a contract on the ground that the corporation had no legal authority to make it at the place where made.

In this respect the case is parallel with the one at bar; that is to say, that the case is between a corporation and an individual, and not between the corporation and the state or sovereign. The authority to exercise the privilege sought to be exercised is the question involved in that case as well as the one at bar, but beyond this there were some questions involved in that case that are not involved in this, viz: that the bank was seeking to compel the performance of a contract which had been made between the parties, and that the defendant, Earl, had profited and been benefited by the contract, and had received something of value therefor from the company. These questions are not involved here.

Nowhere does the court in this case question the right of the defendant, Earl, to maintain his defense, if his contentions are well founded, i. e., that the bank had no legal authority to discount bills in a state other than where creat-

ed; and nowhere in the case does the court intimate that the rule of comity would prevent the defendant from maintaining his defense if the authority was repugnant to the laws of the state, or if the contract was an illegal one because of the want of authority on the part of the company to make contracts of that character within the state of Alabama. The court in this case says:

"The only rights it can claim are the rights which are given to it in that character, and not the rights which belong to its members as citizens of the state. And we now proceed to inquire what rights the plaintiffs in error, a corporation created by Georgia, could lawfully exercise in another state; and whether the purchase of the bill of exchange on which this suit is brought was a valid contract, and obligatory on the parties."

" * * *'A corporation * * * is an artificial being, invisible, intangible, and existing only in contemplation of law. Being a mere creature of the law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence.' * * * Corporations created by statute must depend both for their powers and the mode of exercising them, upon the true construction of the statute itself."

"It may be safely assumed that a corporation can make no contracts and do no acts either within or without the state which creates it except such as are authorized by its charter, and those acts must also be done by such officers and agents and in the manner as the charter authorizes."

The term charter as herein used refers to the law of the state authorizing the formation of corporations. Applying these rules to this case, where is the provision in the laws of the State of Kansas or in this Territory that authorizes this company to acquire the property involved in this

case in the manner in which it is sought to be acquired? Further the court says:

"And if the law creating a corporation does not by a true construction of the words used in the charter give it a right to exercise its powers beyond the limits of the state, all contracts made by it in other states would be void."

Now, it will be noticed that it is not the charter or articles of incorporation that must give the company the power to transact business beyond the limits of the state, but it is the law under which the corporation is created which must give the corporation the right to exercise its powers beyond the limits of the state; otherwise, says the supreme court of the United States: "All contracts made by it in other states would be void."

The laws of the State of Georgia authorized the Bank of Augusta to deal in bills of exchange, and that law, says the supreme court, "gives it the power to purchase foreign bills as well as inland;" or, in other words, to purchase bills payable in another state. "The power thus given clothed the corporation with a right to make contracts out of the state in so far as the State of Georgia could confer it."

And this was largely the turning point in that case; that is, the foundation for the right of the bank to transact business in a foreign state, and make contracts therein, was the authority given the bank by the laws of the State of Georgia to deal in bills of exchange, which was held to give it power to purchase foreign bills as well as inland.

Being organized then in harmony with the law which provided for the organization of banks of discount, to operate within the State of Georgia, and such contracts being within the scope of its limited powers in the state in which

it was created, the court holds that by the rule of comity such power might be extended beyond the limits of the state, and such contracts as they were allowed to make within the state in which the organization was created might be made in the sovereignty in which it does not reside. The court further says:

"The corporation must no doubt show that the law of its creation gave it the authority to make such contracts through such agents. Yet, as in the case of a natural person, it is not necessary that it should actually exist in the sovereignty in which the contract is made. It is sufficient that its existence as an' artificial person in the state of its creation is acknowledged and recognized by the law of the nation where the dealing takes place; and that it is permitted by the laws of that place to exercise there the powers with which it is endowed."

Now, where did the corporation in this case show that the laws of the State of Kansas gave it authority to make such contracts, and where did the corporation show that it was permitted by the laws of the Territory to exercise here the powers with which it claimed to be endowed? Speaking further, the supreme court says:

"Every power, however, of the description of which we are speaking, which a corporation exercises in any state, depends for its validity upon the laws of the sovereignty in which it is exercised."

Again, we ask, applying this rule, where is the law of this Territory upon which the defendant in error must depend for the validity of its contract or authority or power to make the same? And the supreme court further says: "A corporation can make no valid contract without their sanction;" that is, the sanction of the sovereign where it is

exercised, "express or implied." Now, there is no express or implied sanction in any of the laws of this Territory, for the defendant company to make any such contract. And again the supreme court says in this case that when a corporation is rightfully and legally formed in one state:

"The courts of justice have always expounded and executed contracts according to the laws of the place in which they were made, provided that law was not repugnant to the laws or policy of their own country. The comity thus extended to other nations is no impeachment to sovereignty. It is the voluntary act of the nation by which it is offered, and is inadmissible when contrary to its policy or prejudicial to its interest."

Had the supreme court found that the Bank of Augusta did not by virtue of the laws of the state in which it was created have the power or authority to discount bills of exchange within its own state, the decision would have been, that by extending to it the rule of comity, it could not enforce such a contract in another state, and a defense to such an action could be successfully maintained by an individual in a collateral proceeding, where the right of franchise was not directly involved.

We think this is sufficient to put at rest for all time the contentions made by the defendant in error that the plaintiff in error in this case cannot maintain the propositions for which he is contending.

We now come to the question of what, if any, effect has the act of the legislature of 1903 upon the parties and their standing in this case? This act is chapter 9 of the Session Laws of 1903, and is in the way of an amendment of the Laws of 1893, and among other things intends to provide that

corporations may be organized for the purposes named in the charter of this company. The provision of the act to which our attention is called and which it is claimed has a bearing here is that part of the proviso which reads as follows:

"Provided further, that any corporation heretofore organized or attempted to be organized for any of the purposes herein specified under the laws of this Territory, or in another state or territory, and which has filed a copy of its charter or articles of incorporation in the office of the secretary of this Territory, as required by law, shall have the same power to transact business as if incorporated under the terms of this act, and shall have the privileges, franchise and powers conferred by this act, the same as any corporations created under the terms of this act, and the acts of such corporations are hereby legalized, confirmed and ratified: * * * *"

Now it is plain from the reading of this provision that in some respects it was intended to act prospectively and in others retrospectively. In so far as the act gives to these defective corporations the same power to transact business as if incorporated under the terms of this act, and in so far as it gives to them the privileges, franchises and powers conferred by this act, the same as any corporation created under the terms of the act, it is intended to act prospectively; but in so far as it attempts to legalize and confirm the past acts of the corporations, it is plainly intended to act retrospectively.

Now, applying the familiar rule that acts will not be given a retrospective action unless plainly intended, the powers given to the corporations included in the act, and the privileges and franchises granted, are plainly prospective, and date from and after the passage of the act. And ap-

plying the rule that retrospective statutes are not valid where they impair the obligation of existing contracts, can this act be held to affect the subject matter and the parties to this case?

It will be noticed that that part of the act which is intended to be retrospective is of. a curative character; that is, it is intended to cure the defective acts of the corporations. It was probably not intended to undertake to breathe life into inanimate objects. It can only be held to apply to acts performed by the company which, because of the conditions, were defective or illegal, and to ratify and confirm them.

Now, as between the company and the plaintiff in error in this case, there is no defective or illegal act which the company has performed, and therefore, there is no defective or illegal act which can be held to be cured or ratified by this act. Besides, if it should be held that this act was intended to and did reach the subject-matter of this action, and to breathe life into that which did not before legally exist, it would affect the contract made between the plaintiff in error and his grantors, and for that reason the act would be void. We do not wish to be understood as holding the act to be void, because we do not think it affects the parties to this case in that manner, or was intended so to do. What, if any, acts it may be held to affect, legalize and ratify; it is not now necessary to determine, and we do not so determine. The only question that we do now decide is that the act has no effect upon the subject-matter or the parties in this action.

One further observation: The facts disclosed in the

record and referred to in the former opinion show that Barnes, Dalton, Lynch and others formed a copartnership, generally called a syndicate, for the purpose of laying out the townsite of Ponca City; and by their inducement, advertisement and conduct, induced the plaintiff in error, together with many others, to go upon the lots included in the townsite, and occupy and improve the same; that they agreed that upon the performance of certain conditions of occupancy and improvement, and the payment of a small sum, they would convey to the occupants the legal title to the lots which they occupied.

The plaintiff in error having fulfilled the conditions as to improvement and occupancy was, upon the payment of the sum determined upon by the syndicate, entitled to a deed transferring to him the full legal title. He paid that sum to Barnes and Dalton, members of the syndicate or copartnership who at the time held the legal title. The other members of the company and those who were the incorporators of the defendant company were parties to the contract with the plaintiff in error and had knowledge of and participated in the inducements held out to him and others to go upon the townsite and occupy and improve the property, so that the doctrine of *lis pendens* upon which the trial in the court below was largely had, became and was of very slight importance in determining the rights of the parties in this case, for the reason that notwithstanding it should be admitted that the transfer of the title to this lot from Barnes and Dalton to the plaintiff in error was made at a time when suit was pending between the defendant corporation and Barnes and Dalton over this and other property, and that the suit was such a one as would create *lis pendens* notice; still, that fact

would be of little consequence here, for the acts of the former syndicate or copartnership, and the individual members thereof, and this corporation and its incorporators and officers, were so interwoven and combined that even if the transfer had not been made from Barnes and Dalton to the plaintiff in error, and the company now held the legal title, the plaintiff in error at any time could have maintained his action to compel this company to transfer the lot to him, upon the payment of the monetary consideration agreed upon.

Having reached the conclusion that the propositions laid down in the former opinion are correct and should be adhered to, and for the further reasons expressed in this opinion, the judgment heretofore entered in this case will be allowed to stand, and the judgment of the court below quieting title to the premises in the said corporation will be set aside and the cause remanded with direction to enter judgment in favor of and quieting title in the plaintiff, John T. Myatt.

Hainer, J., who presided in the court below, not sitting; all the other Justices concurring.